# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7470 | **DATE** | 9/26/2001 |
| **CASE TITLE** | Donna B. Fischer vs. Ameritech | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 10/18/2001 at 9:00 A.M.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment (Doc. No. 33-1) is granted without prejudice to further proceedings on Plaintiff's amended complaint. Plaintiff's motion for summary judgment (Doc. No. 44-1) is denied. Defendant's motion to strike various documents (Doc. No. 48-1) is denied without prejudice as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 27 2001 | 64 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 9/26/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | FILED FOR DOCKETING 01 SEP 26 PM 4: 59 | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DONNA B. FISCHER,　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　)
　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　)　　No. 98 C 7470
　　　　　　　　　　　　　　　)
AMERITECH,　　　　　　　　　)　　Judge Rebecca R. Pallmeyer
　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　)

DOCKETED

SEP 2 7 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Donna Fischer ("Fischer"), pro se, brings this action against her former employer, Defendant, Ameritech Consumer Services, a division of Ameritech Services, Inc. Fischer alleges that in suspending her, failing to promote her, and failing to accommodate her back problems, Ameritech violated both the Americans with Disabilities Act, 42 U.S.C. §12101 et. seq. ("ADA") and Title VII of the Civil Rights Act of 1964. Ameritech now moves for summary judgment on each of Fischer's claims.[1] For the reasons set forth below, Ameritech's motion for summary judgment is granted.

## FACTUAL BACKGROUND

### A.　　Plaintiff's Employment History and Suspension

In July 1995, Ameritech hired Fischer to work as a customer service representative at its facility in Arlington Heights, Illinois. (Ameritech's Rule 56.1(a) Statement, hereinafter "Amer. Rule 56.1(a) St." ¶ 4.) Fischer's primary responsibility

---

[1]　　Fischer also moved for summary judgment on all claims. The court considers the reasoning in this opinion sufficient to address the arguments raised by Fischer in her motion for summary judgment and will not address Fischer's motion separately.

64

in this position was to respond to telephone calls from Ameritech's customers regarding various inquiries, orders, requests, and complaints. (Amer. Rule 56.1(a) St. ¶ 6.)[2] The record is silent concerning Fischer's work performance prior to 1998.

On February 12, 1998, Angie Sciortino, Fischer's direct supervisor at the time, received a telephone call from a customer who had a complaint about how he had been treated by Fischer. (Affidavit of Angela Sciortino, (hereinafter "Sciortino Aff.") ¶ 8; Ex. D to Sciortino Aff.[3]) The customer told Sciortino that Fischer had given him a "shut up and pay for it attitude," and reported that Fischer had scoffed, "it's only $15, can't you just pay for it?" (Ex. D to Sciortino Aff.) The customer told Sciortino that he was particularly upset about this attitude because, as he also told Fischer, $15 is a lot of money for a person living on a fixed income. (*Id.*)

Sciortino spoke to Fischer about the complaint and asked Fischer to review her own conduct and consider how she might have handled the call more effectively. (Sciortino Aff. ¶ 8; Ex. D to Sciortino Aff.) According to Sciortino, Fischer responded, "Well, don't ever bother helping him, just send him to HOL," (a reference to

---

[2]      In an amended complaint filed on March 15, 2001, Plaintiff has presented claims relating to her January 18, 1999 discharge from Ameritech. Because that amended complaint was filed after the briefing on the parties' cross-motions for summary judgment, Plaintiff's wrongful discharge claim is not addressed here.

[3]      Ex. D to Sciortino's Affidavit is a memorandum prepared by Sciortino in which she recounts the details of the complaint she received from a customer about Fischer's conduct on the phone with him.

Ameritech's department responsible for holding billing services[4]).  (Sciortino Aff. ¶ 8; Ex. D to Sciortino Aff.)  Sciortino warned Fischer that this type of customer treatment was unacceptable and that she should never take such a tone with a customer again. (Sciortino Aff. ¶ 8; Ex. D to Sciortino Aff.)

On February 19, 1998, Jay Bennett, an Ameritech manager, received a complaint[5] from a customer, Mr. Huber, about an Ameritech customer service representative named "Donna."  (Affidavit of Corwin "Jay" Bennett, hereinafter "Bennett Aff.", ¶ 3.)  Mr. Huber complained to Bennett that when he told Donna that he, Mr. Huber, could not remember the name of the Ameritech customer service representative with whom he had previously spoken about receiving a credit for a caller I.D. unit erroneously charged on his bill, Donna responded: "Well, that wasn't smart, how do you expect to get the credit if you don't know who told you this?" (Bennett Aff. ¶ 3; Ex. A to Bennett Aff.[6])  Mr. Huber explained to Bennett that he felt he had been treated very badly and that he was more upset about how he had been treated by Donna than about the problem with the credit.  (Ex. A to Bennett Aff.)

Bennett sent an e-mail detailing Mr. Huber's complaint to Sciortino.  (Bennett

---

[4]     There is no evidence in the record about the function of this department or the circumstances in which Ameritech considers it appropriate to transfer a customer to this department.

[5]     The record is unclear whether Mr. Huber's complaint came in the form of a telephone call or a letter.

[6]     Ex. A to Bennett's Affidavit is a copy of an e-mail sent by Bennett to Sciortino recounting the phone call Bennett had received from Mr. Huber who had called to complain about how Donna had treated him on the phone.

Aff. ¶ 3; Ex. A to Bennett Aff.; Sciortino Aff. ¶ 4.) Sciortino then reviewed Ameritech's customer service records and confirmed that on February 13, 1998, Donna Fischer had spoken to Mr. Huber about a telephone I.D. unit and certain charges. (Sciortino Aff. ¶ 5; Ex. B to Sciortino Aff.[7])

After confirming that it was Fischer who had spoken to Mr. Huber, Sciortino called Mr. Huber on February 20, 1998. (Fischer Dep. 2, at 74; Sciortino Aff. ¶ 6.) Mr. Huber told Sciortino that Donna had said, "Well, that was stupid, how do you expect to get the credit if you don't know who you talked to?" and that Donna had been "short and curt" with him, had "talked down to him," and had generally been "demeaning and rude." (Sciortino Aff. ¶ 7; Ex. C to Sciortino Aff.)[8]

Fischer acknowledges in her deposition that she spoke with Mr. Huber. (Deposition 2 of Donna Fischer, at 71-72, 75.) Although she does recall speaking to him about the double-billing of a telephone I.D. unit, Fischer denies having been rude to Mr. Huber and suggests several possible explanations for his complaint, including that

---

[7]     Ex. B to Sciortino's Affidavit is a copy of Ameritech's customer service records regarding Mr. Huber, which reflected that Mr. Huber spoke to Fischer on February 13, 1998 regarding a caller I.D. unit and charges.

[8]     As noted, there is almost no evidence in the record about Fischer's work performance at Ameritech prior to 1998. In Fischer's Memorandum in Support of Motion for Summary Judgment, she mentioned that "prior to this occurrence [she] had been given a spotlight on excellence award for recognition of your [sic] commitment to excellence in customer service," and attached a copy of the certificate she was given dated January 3, 1998. Fischer offers no explanation as to why she was chosen to receive this award, nor as to the significance of being so chosen.

he was speaking to a different Ameritech representative, or that "they"[9] are lying about what Mr. Huber actually said. (Fischer Dep. 2, at 72, 118-19.)

Sciortino considered Fischer's handling of the February 13 call from Mr. Huber to be a serious violation, especially in light of the warning Sciortino had given Fischer about the call on February 12. (Sciortino Aff. ¶ 9.) Sciortino decided to place Fischer on suspension pending termination[10] and informed both her immediate supervisor, Janet Aguilar, as well as Aguilar's immediate supervisor, Linda Murrain, of her decision. (*Id.* ¶¶ 9, 11, 12; Affidavit of Janet Aguilar, hereinafter "Aguilar Aff." ¶¶ 4, 5.) Both Aguilar and Murrain concurred with Sciortino's decision to place Fischer on suspension pending termination. (Sciortino Aff. ¶ 12; Aguilar Aff. ¶ 2.)

Pursuant to the Collective Bargaining Agreement ("CBA") between Ameritech and Fischer's union, Local 383 I.B.E.W., Ameritech managers were required to meet with union representatives to discuss the contemplated termination. (Sciortino Aff. ¶ 10.) On February 24, 1998, this meeting was held and Fischer was officially suspended pending termination. (Fischer Dep. 2, at 69-71; Ex. 18 to Fischer Dep. 2; Sciortino Aff. ¶ 13; Aguilar Aff. ¶ 6.) For reasons that are not clear in this record, Fischer was not terminated at the end of this suspension, but rather, on March 6, 1998,

---

[9]     Fischer does not explain who she thinks might have been lying about what Mr. Huber said.

[10]     At Ameritech, a suspension pending termination means that the employee is suspended and Ameritech intends to terminate the employee's employment. (Sciortino Aff. ¶ 10.)

Fischer entered into a Back-to-Work Agreement with Ameritech.[11] (Fischer Dep. 2, at 193-94, 197.)

Although the exact nature of the claim is unclear, Fischer complains that because of the suspension, she was denied the opportunity to interview for a promotion to a new position within Ameritech. (*Id.* at 31, 34-39; Fischer's Memorandum in Support of Motion for Summary Judgment, hereinafter "Fischer M.S.J." ¶ D.5.) Fischer believed she was qualified for the new position because she held a similar position for a previous employer, Illinois Bell Telephone. (Fischer M.S.J. ¶ D.5; Fischer's Reply Brief in Support of Motion for Summary Judgment, hereinafter "Fischer Reply," at 2.) In her deposition, however, Fischer was unable to identify the title of the position she sought or to describe its duties or qualifications, except to say that it involved "working on business accounts." (Fischer Dep. 2, at 34-35.) Fischer does not know any of the people that were hired for the position. (*Id.* at 38.) Fischer testified that she understood that some of the people may have been hired from an operator services office that closed, but otherwise, Fischer knows nothing about their work experience or qualifications. (*Id.* at 36-40.)

According to Fischer, certain other customer service representatives at Ameritech also had incidents of customer mistreatment on their record but were

---

[11] In the Back to Work Agreement, Fischer acknowledged that she was suspended pending dismissal for customer mistreatments and that if she were the subject of any future complaints from customers, or were observed being rude, inappropriate or unprofessional, such behavior would be considered just cause for immediate dismissal.

treated better than she was. (*Id.* at 248.) Two of the employees Fischer identifies as examples of this alleged unfair treatment were in fact fired for customer mistreatments. (*Id.* at 248, 251-53.) Fischer does not know who terminated them, when they were terminated, or who their respective supervisors were. (*Id.*) She noted, however, that one of these employees had been allowed to write the company newsletter and the other was allowed to be a "TC," a position not described in the record but presumably one that Fischer deemed to be desirable.[12] (*Id.*) Fischer also claims that another customer service representative, Mr. O'Leary, should have had many customer mistreatments on his record because he was very "boisterous." (*Id.* at 254.) Fischer offers no explanation of what she means by his boisterousness or when it supposedly occurred, nor does she offer any evidence to show whether or not Mr. Leary in fact had any customer mistreatments on his record. Fischer said that Mr. O'Leary had a disability, though she did not identify what the alleged disability was, and he was "treated like gold," while Fischer, who believes she also had a disability, was "treated like dirt." (*Id.* at 141.)

At the time Sciortino decided to suspend Fischer pending termination, she did not know that Fischer was applying for a promotion. (Sciortino Aff. ¶ 16.) Similarly, at the time of Fischer's suspension, Sciortino did not know that Fischer was of Native American heritage, was not aware of any work restrictions due to Fischer's alleged

---

[12]    Fischer does not explain when these employees were given these extra responsibilities, why they were given these extra responsibilities, nor for how long they actually performed these extra responsibilities.

back condition, and did not believe Fischer to be disabled. (Sciortino Aff. ¶¶ 14, 15.)

Despite Ameritech's documented reasons for suspending Fischer, Fischer believes that she has been the target of ongoing discrimination by Ameritech on account of both her alleged disability and her race or national origin. (Fischer M.S.J. ¶ I.) Ameritech finally terminated Fischer's employment on January 18, 1999. As noted, her termination is not at issue with respect to the pending motions for summary judgment.

## B.  Factual Background of Fischer's Race/National Origin Discrimination Claim

Fischer believes that she is of approximately 1/8th Native American descent, specifically Cherokee Indian. (Fischer Dep. 1, at 23-24.) Fischer's father is German, and her mother is Scottish, Irish, French and Cherokee Indian. (*Id.* at 23-24, 31.)

According to Fischer, certain representatives at Ameritech, including her supervisor Sciortino, knew that she is of Cherokee descent. (Fischer M.S.J. ¶ D.1; Fischer Reply, at 5.) Although Fischer did not specify which Ameritech representatives allegedly knew about her heritage, Fischer rejected Ameritech's and Sciortino's assertions that Sciortino did not know that Fischer was Native American. (*Id.*) In support of her position, Fischer refers to a document attached to her Reply Brief in Support of Motion for Summary Judgment entitled Ex. B - Customer Services Representatives Suspended, Pending Dismissal for Customer Mistreat-Rudeness (hereinafter "Suspension Chart"). (*Id.*) The Suspension Chart lists various Ameritech employees, including Fischer, who have apparently been suspended pending

termination for mistreatment of customers, identifies the race of each such employee, the Ameritech manager involved in the suspension, and each such manager's race. (Suspension Chart.) Fischer has not explained the origin of this chart and there is no evidence in the record that anyone at Ameritech prepared it. Even presuming someone at Ameritech did prepare it, the Suspension Chart does not constitute evidence that Sciortino or anyone else at Ameritech knew of Fischer's Cherokee heritage at the time of Fischer's suspension: a footnote on the document states: "Like the Plaintiff, these customer service representatives entered into Back to Work Agreements with Ameritech." (Suspension Chart.) Clearly the Suspension Chart was prepared after the commencement of this litigation and does not enlighten the court as to anyone's knowledge of Fischer's background at the time of her suspension.

Fischer's best piece of evidence that someone at Ameritech may have known she was of Cherokee descent is a complaint Fischer filed with her union on October 16, 1996, in which she described her grievance as "[d]iscrimination and harassment based on Cherokee heritage and not using illegal drugs." (Fischer's Response to Defendant's Motion for Summary Judgment, hereinafter "Fischer's Response" ¶¶ III, IV.) In the grievance, Fischer does not detail the actions she believed constituted this alleged discrimination and harassment other than to say that she had been called a "loser" by her boss, Larry Zitzke. (*Id.*) Although Fischer clearly identified herself as Cherokee on this document, the record is devoid of evidence as to which Ameritech employee or employees might have seen or known of this grievance. Specifically, there is no evidence that Sciortino knew about this grievance. In light of the fact that Sciortino

was not employed by Ameritech until December of 1996, and was not promoted to management until April of 1997, (Sciortino Aff. ¶ 2), the court deems it extremely unlikely that she would have seen this document.

Fischer offers several additional pieces of evidence that Ameritech staff must have known that she was of Cherokee descent, but none are persuasive. First, Fischer says that she wore clothing that bore the brand name "CHEROKEE" on the front of it, as well as Native American jewelry. (Fischer's Response ¶¶ IV, VII.) Fischer kept a coffee mug on her desk at all times that had an American Indian design on it. (*Id.* ¶ V.) Fischer also kept a piece of Native American artwork on her desk. (*Id.* ¶ VI.) Although Fischer appears to assume that Ameritech staff would recognize her racial background, she stated in her deposition: "Some people think I'm Spanish. Some people think I'm Greek. Some people think I'm Italian. And some people say, you know, are you American Indian." (Fischer Dep. 1, at 29.)

According to Fischer, Linda Murrain (the direct supervisor of Janet Aguilar, who is the direct supervisor of Sciortino, who is the direct supervisor of Fischer) certainly knows that Fischer is Native American because Murrain herself is African American and Fischer has "never met a black person that could not identify that [she] was of Native American heritage. They can spot it right away." (Fischer Dep. 2, at 152.) Fischer also recalls a conversation with Aguilar during which Aguilar mentioned the name of her daughter, a name Fischer thought sounded Native American, and Fischer

10

says she told Aguilar that she was Native American, too. (*Id.* at 152-53.)[13]

Fischer acknowledges that none of the supervisors involved in the decision to suspend Fischer pending termination made any sort of derogatory comment regarding Fischer's race or national origin. (*Id.* at 140-41, 145, 147, 149, 151.)

The only incident that Fischer specifically highlights as indicative of the discrimination Fischer allegedly suffered based upon her race or national origin while at Ameritech had to do with the use of Sciortino's phone for personal calls. Fischer asked Sciortino for permission to use Sciortino's phone to make personal calls, and Sciortino told Fischer what she told all employees that asked to use her phone, that she could use the phone so long as she first asked permission and only used it during Fischer's personal time.[14] (Sciortino Aff. ¶ 17.) Fischer believes that Sciortino denied Fischer permission to use the phone in a discriminatory manner. (Fischer Dep., 2 at 49-54.) Fischer contends that Sciortino knew that Fischer was German and discriminated against her because, although Fischer had a German last name, she does not appear to be German. (*Id.*) According to Fischer, German women are angered by German men who marry non-German women. (*Id.* at 50-51.) Fischer believes that Sciortino herself is German because Fischer thinks Sciortino looks German. (*Id.* at 54.) Fischer concludes, therefore, that Sciortino did not let Fischer use her telephone

---

[13]    Fischer offers no explanation as to why someone who gives her child a name that sounds Native American would be motivated to discriminate against someone of Native American descent.

[14]    Fischer does not state when this conversation about the use of Sciortino's phone took place.

because Fischer's father did not marry a German woman and because Fischer is of Native American heritage. (*Id.* at 52.) Fischer acknowledges that this assessment of Sciortino's alleged discrimination is not based on anything said by Sciortino, but nevertheless, Fischer says that she has "gotten enough of the message." (*Id.* at 54.)

Fischer believes that Aguilar also discriminated against her on account of her Native American heritage. (*Id.* at 142.) Fischer's only examples of this discrimination are that Aguilar Exhibited "real coldness, . . . dirty looks, just . . . bad vibes." (*Id.*)

C. **Factual Background of Failure to Accommodate Fischer's Disability Claim**

According to Fischer, ever since she fell in the basement of her workplace on January 14, 1997, she has had two bulging or herniated disks that sometimes cause her pain. (Fischer Dep. 2, at 199; Fischer Dep. 3, at 270.) Throughout her deposition, Fischer spoke at length about how she found dealing with Ameritech's customers to be extremely stressful and repeatedly emphasized that this stress was a major aggravator of her back condition. (Fischer Dep. 2, at 226-27; Fischer Dep. 3, at 275.) When asked if the "abuse inflicted by the customer" was the primary aggravation to her back problems, Fischer responded that even more aggravating to her back than the customers, was "the supervisor."[15] (Fischer Dep. 2, at 229.) Fischer believed that the combination of sitting all day and the build-up of tension from people "screaming" at her all the time made her back worse. (*Id.* at 164.) Fischer pointed out that the tension is so much a part of her back pain that, by the end of her workday, when she

---

[15]     Fischer did not specify to which supervisor she was referring.

knew that the tension and stress was almost over, the pain was usually gone. (*Id.* at 165.)

According to Fischer, the biggest hindrance she experiences on account of her back problem is that occasionally, when she goes up the stairs, she "loses her back," by which she means that she feels as if her lower back suddenly takes on extra weight and she has a sensation of a lump or pressure in her back. (Fischer Dep. 3, at 271, 277.) Fischer lives in a tri-level house with carpeted stairs, but she claims that her back problem is worse on stairs that are not carpeted, such as those at the Ameritech office. (*Id.* at 272, 289.) She acknowledged, however, that she did not "lose her back" every time she went up uncarpeted stairs, and that she was sometimes able to go up and down the stairs at Ameritech two and three times without "losing her back." (*Id.* at 272.)

In October of 1997, Fischer saw a doctor at Physician Care, Ltd. who completed a "Back to Work Notice" that advised her not to climb stairs. (Ex. 26 to Fischer Dep. 3.) Fischer worked primarily on the first floor of the building and was allowed to use the elevator when necessary to move between floors. (Fischer Dep. 3, at 383.) She complains, nevertheless, that on two occasions she felt she had no choice other than to take the stairs. On one such occasion, Charles Allen[16] came to the first floor where Fischer worked, called Fischer to a meeting on the second floor, and then turned and quickly climbed the stairs himself. (Fischer Dep. 2, at 218.) Fischer decided to take

---

[16] There is no evidence in the record about what position Charles Allen held at Ameritech.

the stairs behind Allen, instead of taking the elevator, and then, once she was on the stairs, reminded Allen that she was not supposed to run up the stairs. (*Id.*) Allen told Fischer that she should have gone to the elevator. Fischer replied that Allen had taken her this way, and according to Fischer, Allen responded by urging her on with the words, "Come on, we got to go this way." (*Id.*) Fischer did not go back and take the elevator, but instead followed Allen up the stairs to the meeting. (*Id.*)

On another occasion, Allen again came down to the first floor and told her she needed to hurry and get off of a call and get up to a meeting on the second floor. (Fischer Dep. 3, at 385-86.) Allen did not tell her to take the stairs, nor did he tell her that she should use the elevator. Because she felt she was in a hurry, however, Fischer took it upon herself to take the stairs. (*Id.*)

Beyond the difficulties Fischer said were brought on by stress and climbing the stairs, Fischer noted other issues that arose with respect to her back while she worked for Ameritech. For example, at some point Fischer asked Ameritech to provide her with a chair that would be more comfortable for her back, and Ameritech did in fact provide her with such a chair. (Fischer Dep. 3, at 320.) Fischer also said that she asked for a standing work station, and that she be allowed to have increased mobility to release the pain from her back. (*Id.*) Fischer did not specify either when she made these requests, or to whom she made them, but she appears to believe that these requests were not honored.

Fischer also felt that she was unable to meet the time constraint imposed by

having only fifteen minutes for her breaktime. (*Id.* at 322.) Although Fischer was less than clear on this point, she said that she believed she had asked Faith Baran, an independent contractor who worked with Ameritech on employee attendance issues, to add five minutes to her break time. (*Id.* at 330.) The evidence in the record that corroborates that Fischer made such a request is a document entitled "Sickness Disability Administration - Status Report," dated May 3, 1996, approximately nine months prior to the date Fischer claims these back problems started. (Ex.[17] to Fischer Reply.) This document stated that Fischer was to be allowed five extra minutes for her breaks, through May 19, 1996, because "she may be slower in getting to and from the break room."[18] (*Id.*) There is no explanation in the record as to why Fischer made this request prior to her slip-and-fall in January of 1997, and there is no evidence that she ever renewed the request after this accommodation expired on May 19, 1996.

Shortly after her back problems started in January of 1997, Fischer told her manager at the time, Larry Zitsky, that she could no longer run to make it back from the break room where she made her personal phone calls, and Zitsky told her that she could use the phone in his office so that she would not have to walk as far during her breaks. (*Id.* at 322-23.) As previously noted, Fischer did not have such free access to her supervisor's phone when she worked under Sciortino, a situation Fischer attributed

---

[17]     Because some of the Exhibits submitted by both Fischer and Ameritech were not consistently labeled or identified, the court will simply refer to these as Exhibits and note the submission to which they were attached.

[18]     The document does not state who at Ameritech made the decision to allow Fischer to add an extra five minutes to her break time for this period of time.

to her father's German heritage and her own Native American appearance.

Ameritech documented each employee's break time and general attendance on computer-generated "Schedule Adherence Reports." (Ex. to Fischer Dep. 3.) At least occasionally, a supervisor wrote comments about Fischer's attendance or the duration of her breaks on these Schedule Adherence Reports and returned them to her, noting, for example, times that she was tardy. (Fischer Dep. 3, at 351-52, 354.) Fischer's Schedule Adherence Reports reflected that, on a number of dates, she was late getting to work, and late returning from breaks or from her lunch break. (*Id.* at 342, 347.) When asked at her deposition why she was late on each of these dates, Fischer made no mention of her back problems and had no knowledge as to why she was tardy. (*Id.*)

Fischer acknowledged that, although she was marked tardy numerous times on her Schedule Adherence Reports, her pay was docked on only one occasion, January 26, 1998, when she lost pay for a quarter-hour of work. (*Id.* at 342.) At this time, Fischer made approximately $11.63 per hour. (Fischer Dep. 5, at 66.) Fischer believed that on this occasion, she was charged as tardy because the computers were not working properly; she admitted that this event had nothing to do with discrimination on account of her alleged disability or her race or national origin. (*Id.* at 64-65.) Fischer acknowledged, further, that she was never suspended for tardiness, and aside from her pay being docked once and being marked as tardy on her Schedule Adherence Reports, the only allegation she made with respect to the consequences of her tardiness was that it "seemed like [she] was almost suspended for tardiness." (Fischer Dep. 3, at 329, 335.)

Despite her back condition Fischer testified that she was able to perform her job, and, although her job aggravated her back, it did not prevent her from being able to work. (*Id.* at 298-99.) She testified that she took medicine that helped her perform her job without pain. (*Id.* at 164-65.) She also found physical therapy to be "very, very effective" and believed that with physical therapy, her back problem could almost be controlled as long as she did not aggravate it by running up the stairs. (*Id.* at 274, 276.) Fisher said that she was undergoing physical therapy virtually continuously through about March of 1999. (*Id.* at 274-75.)

No doctor has ever told Fischer that she was unable to work, and since being terminated by Ameritech in January of 1999, Fischer has worked at at least eight different jobs, most of which she admits involved a great deal of sitting. Fischer requested an accommodation at just one of these eight jobs so that she would not have to use the stairs. (*Id.* at 298-310; Fischer Dep. 5, at 45.) None of the jobs Fischer has held since leaving Ameritech appear to have involved the level of stress that Fischer experienced at Ameritech. (*Id.*)

## D.     Fischer's EEOC Charge

On May 28, 1998, Fischer filed a Charge of Discrimination with the EEOC ("Charge"). (Ex. 11 to Fischer Dep. 2.) In the "Cause of Discrimination Based On" section of the Charge, Fischer checked both the box marked "race," as well as the box marked "disability."[19] (*Id.*) The EEOC terminated its investigation and issued Fischer

---

[19]     Although Fischer did not check the box marked "national origin," the
(continued...)

17

a Notice of Right to Sue.[20]  (Ex. 8 to Ameritech M.S.J.)

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Alexander v. Wisconsin Dept. of Health and Family Services*, ___ F.3d ___, No. 00-2603, 2001 WL 965938, *5 (7th Cir. Aug. 27, 2001). A genuine issue of material fact exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Alexander*, 2001 WL 965938, at *5 (citing *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)). When making this determination, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Alexander*, 2001 WL 965938, at *5.

### B.    Discrimination in Violation of the ADA

Fischer alleged in both her EEOC charge and in the complaint she filed in this court that Ameritech discriminated against her in violation of the Americans with

---

[19](...continued)
court's discussion with respect to her claims alleging discrimination on account of her race apply equally to any claims she may raise with respect to her national origin.

[20]     The Notice of Right to Sue is undated and the record is unclear as to when Fischer received it.

Disabilities Act. A plaintiff may allege such discrimination in either of two forms: (1) a disparate treatment claim, alleging that a qualified individual with a disability was treated differently than a non-disabled employee due to his or her disability, *see, e.g., Hoffman v. Caterpillar, Inc.*, 256 F.3d 568 (7th Cir. 2001); and (2) a failure to accommodate claim, alleging that the employer did not make reasonable accommodation for the known physical or mental limitations of an otherwise qualified individual, *see, e.g., Winfrey v. City of Chicago*, 259 F.3d 610, 614 (7th Cir. 2001). In both the EEOC charge and the complaint, Fischer clearly raised a failure to accommodate claim, but did not mention a disparate treatment claim.[21]

No matter the type of discrimination alleged, whether it be disparate treatment or failure to provide a reasonable accommodation, a plaintiff proceeding on such a claim must first establish that she was "a qualified individual with a disability." 42 U.S.C. § 12112(a); *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001). Ameritech maintains, and this court agrees, that Fischer is unable to meet this threshold burden.

Under the ADA, a disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B)

---

[21]     In her EEOC charge, Fischer stated: "Respondent failed to accommodate my disabilities by recording me as tardy on or about December 4, 1997, March 30, 1998, and April 3, 1998. Respondent erroneously accused me of tardiness on January 26, 1998 and docked me 0.25 hours pay. I have been subjected to criticism and harassment by Respondent. . . . I believe that I have been discriminated against because of my disabilities in violation of the Americans with Disabilities Act of 1990 in that Respondent failed to comply with my request for accommodation by recording me as tardy on various occasions."

a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(2). Fischer has proceeded under the first prong of this definition, alleging that her back condition is a physical impairment that substantially limits one or more major life activities. According to EEOC interpretive guidelines, "major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). As it has been defined, "substantially limits" means that the person is either unable to perform a major life function, or is significantly restricted in the duration, manner, or condition under which the individual can perform a particular major life activity, as compared to the average person in the general population. *See* 29 C.F.R. § 1630.2(j). Fischer failed to specify in which major life activity she was substantially limited. In her motion for summary judgment, Fischer claimed that her "physical impairment substantially limits her ability to sit for long periods of time, to stand for long periods of time, to climb steep, uncarpeted stairs, and to get up from a sitted [*sic*] position after the back has been aggravated and walking at times." (Fischer M.S.J., at 7.) From this list, only the reference to "walking at times" actually implicates a major life activity. The record is devoid of any claim by Fischer, or any evidence, that her ability to walk is substantially limited, except, perhaps, with respect to her occasional difficulty with climbing stairs. Fischer is able to walk up and down the stairs in her tri-level home. At Ameritech, Fischer was able to take the stairs numerous times , sometimes two and three times in a row, without difficulty. As long as she took the stairs slowly and carefully, Fischer was usually fine. It appears from the record that it was only when

she tried to rush or hurry up the stairs that her back problems were aggravated.

This court is disinclined to find that Fischer's somewhat limited ability to climb the stairs constitutes a substantial limitation on the major life activity of walking. Ample authority defeats her claim. For example, the EEOC provided an example of substantially impaired walking that involves "an individual who, because of an impairment, can only walk for very brief periods of time." 29 C.F.R. §1630.2(j). In a case in which the plaintiff had a limitation similar to Fischer's, *Ragan v. Jeffboat, LLC*, 149 F. Supp. 2d 1053, 1064 (S.D. Ind. 2001), the plaintiff alleged that, because he was told by a doctor to avoid walking up or down inclined surfaces, he was substantially limited in his ability to walk. The court disagreed, noting that he was "not precluded from walking on flat surfaces. . . . [n]or was he restricted in the amount of walking he could engage in." *Id.* In several other cases, plaintiffs had similar or even more severe limitations on their respective abilities to walk than Fischer, and these restrictions were held not to satisfy the ADA standard for disabilities. *See. e.g., Puoci v. City of Chicago*, 81 F. Supp. 2d 893 (N.D. Ill. 2000) (plaintiff who, as a result of post polio syndrome, walked with a limp, had pain and discomfort when walking on soft surfaces, experienced numbness and fatigue in his right leg and thigh when walking, had difficulty climbing stairs, but did not use a cane or a crutch and had no medical restrictions on walking, did not have a disability under the ADA); *Banks v. Hit or Miss, Inc.*, 996 F. Supp. 802 (N.D. Ill. 1998) (plaintiff who had corrective surgery on both feet, could only walk short distances, had chronic foot pain, and was limited by her doctor

to (1) working no more than eight hours at a time; (2) taking fifteen minute breaks every few hours; (3) not working on a ladder; and (4) wearing lace-up shoes, was not disabled); *Kelly v. Drexel Univ.*, 94 F.3d 102 (3d Cir. 1996) (plaintiff who, because of degenerative joint disease, could walk only a mile at a time, could not jog, and had trouble climbing stairs, but used no walking aid, was not disabled). Fischer's difficulties with climbing stairs constitute only a minor restriction on her ability to walk. No rational jury could find that she is substantially limited in the major life activity of walking.

The court also finds that Fischer was not substantially limited in the major life activity of working. To make such a showing, Fischer would have to demonstrate that she is limited in a class of jobs or in a broad range of jobs in various classes. *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001). A plaintiff does not demonstrate such a substantial limitation by showing an inability to do minor aspects of the job while still being able to perform her duties in general. *Harrington v. Rice Lake Weighing Systems, Inc.*, 122 F.3d 456, 460 (7th Cir. 1997). Furthermore, our Court of Appeals has held that the "inability to perform a particular job for a particular employer" does not constitute a substantial limitation on the ability to work, rather, "the impairment must substantially limit employment generally." *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 (7th Cir. 1997), quoting *Byrne v. Bd. of Educ., School of West Allis-West Milwaukee*, 979 F.2d 560, 565 (7th Cir. 1996). Severely undermining any claim by Fischer that she was substantially limited in her ability to work, was her

ability, at least physically, to complete all of her responsibilities throughout her full eight hour shifts at Ameritech, and to voluntarily take on a great deal of overtime. (Fischer Dep. 5, at 67.) No doctor has ever told Fischer that she is unable to work. Moreover, Fischer has held approximately eight jobs since leaving Ameritech, and with the possible exception of one of those eight jobs, Fischer had no trouble functioning at any of those on account of her back. Fischer also referred repeatedly to the high level of stress she experienced at Ameritech, particularly, she claimed, on account of her supervisors. The court will not conclude that Plaintiff is substantially limited in the major life activity of working merely because she cannot work under one supervisor because of anxiety and stress related either to the supervisor's review of the plaintiff's job performance, or to a personality conflict with a supervisor. *See Weiler*, 101 F.3d at 524; *Palmer v. Circuit Ct. of Cook Cty.*, 117 F.3d 351, 352 (7th Cir. 1997). Because the record shows that Fischer was not restricted, significantly or otherwise, in a class of jobs or in a broad range of jobs in various classes, the court finds that Fischer did not raise a reasonable inference that she was substantially limited in the major life activity of working.

This court holds that no reasonable jury could conclude that Fischer has a disability under the ADA. As a result, Fischer's ADA claim cannot withstand Ameritech's motion for summary judgment.

## C. Discrimination in Violation of Title VII

Fischer also asserts that, in violation of Title VII, Ameritech discriminated against her on account of her race – she claims to be one-eighth Cherokee Indian. Title VII established that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1).

A plaintiff may prove race discrimination under Title VII through direct evidence, or indirectly through the burden-shifting mechanism of *McDonnell Douglas*. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Alexander*, 2001 WL 965938, at *6. Fischer has presented no direct evidence of race or national origin discrimination, and therefore, must proceed under the indirect method prescribed in *McDonnell Douglas*.

Under *McDonnell Douglas*, Fischer must first successfully establish a *prima facie* case, meaning she must demonstrate that 1) she was a member of a protected class; 2) she performed her job satisfactorily; 3) despite the satisfactory performance she suffered an adverse employment action; and 4) Ameritech treated others outside the protected class more favorably than Fischer was treated. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Grube v. Lau Industries, Inc,.* 257 F.3d 723, 728 (7th Cir. 2001). If Fischer were able to establish a *prima facie* case of discrimination, Ameritech would be required to offer a legitimate nondiscriminatory reason for the adverse employment

action. *Grube*, 257 F.3d at 728; *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir.

2000). If Ameritech did produce a legitimate reason, Fischer would bear the ultimate

burden of persuading the court that the reason given by Ameritech was merely a

pretext for the discriminatory employment action. *Id.*

Although Fischer did not specify which facts support her *prima facie* case, she

apparently has established the first prong. As for the third prong, it is unclear

precisely which employment action Fischer believes to be an adverse employment

action that is the result of racial discrimination. An adverse employment action is "a

materially adverse change in the terms and conditions of employment [that is] more

disruptive than a mere inconvenience or an alteration of job responsibilities." *Stockett

v. Muncie Indiana Transit System*, 221 F. 3d 997, 1001 (7th Cir. 2000), quoting *Crady

v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). Fischer believes

Sciortino refused to allow Fischer to use Sciortino's telephone because Fischer's father

was German and Fischer allegedly appears to be Native American. "While what is

considered adverse is defined broadly, 'not everything that makes an employee

unhappy is an actionable adverse action.'" *Haugerud v. Amery School Dist.*, 259 F.3d

678, 691 (7th Cir. 2001), quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.

1996). Indeed, the only employment action Fischer experienced sufficient to meet the

third prong is her suspension.

The evidence offered by Fischer to show that similarly situated employees,

presumably of a different race, were treated more favorably than she was falls far short

of establishing the fourth prong of the *prima facie* case. In her deposition, Fischer identified two employees that she believed were similarly situated because they also had, or should have had, numerous customer mistreatments in their records. This is the sole fact offered by Fischer to show that these employees were similarly situated. Fischer did not offer any evidence as to who their supervisors were, how many customer mistreatments were actually in their files, whether they were ever suspended, or who terminated them. Incredibly, rather than offering any evidence to present the factfinder with a basis for comparison, Fischer complained that one employee who allegedly had customer mistreatments in his records was allowed to write the company newsletter, while another was allowed to be a "TC"–a position for which Fischer offered no description and one which the court can only assume Fischer found desirable. Fischer apparently missed the import of the fact that each of these employees was ultimately terminated for their respective customer mistreatments, while she was only suspended. Even if the court somehow found that these other employees were treated more favorably than Fischer, Fischer did not mention, and the record is devoid of any evidence of, the race of any of these employees. Even drawing every possible inference in her favor, there is absolutely no basis upon which any reasonable jury could find that Ameritech treated similarly situated employees more favorably than Fischer.

Because the court finds that Fischer failed to meet the fourth prong of the *prima facie* case, there is no need to proceed any further under the *McDonnell Douglas* burden-shifting method. *See, Logan v. Kautex Textron North America*, 259 F.3d 635,

640-41 (7th Cir. 2001). Nonetheless, the court notes that Ameritech easily meets its "quite light" burden to articulate a legitimate, nondiscriminatory reason for suspending Fischer, which "puts the onus back on [Fischer] to prove pretext." *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999). Ameritech explained that it suspended Fischer because of her repeated misconduct in handling customer telephone calls. Fischer now must show, by a preponderance of the evidence, that Ameritech's proffered reasons for the suspension were not the real reasons, but were merely a pretext for discrimination. *Alexander*, 2001 WL 965938 at *7; *Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001). Fischer has made no such showing. Although at one point in her deposition Fischer posits that perhaps Sciortino and Bennett, the Ameritech representatives that spoke to one of the customers that complained about Fischer, put words in the customer's mouth, this is purely conjecture supported by no evidence whatsoever, and "naked argument that [Ameritech's] explanation was a mere pretext for discrimination does not raise a triable issue of fact." *Flores*, 182 F.3d at 517.

## CONCLUSION

The court finds no disputes of material fact on Plaintiff's claim of adverse treatment based on her national origin and concludes that Defendant is entitled to judgment on that claim as a matter of law. Nor are there facts sufficient to create a dispute concerning Plaintiff's alleged disability. Defendant's motion for summary judgment (Doc. No. 33-1) is granted without prejudice to further proceedings on Plaintiff's amended complaint. Plaintiff's motion for summary judgment (Doc. No. 44-

1) is denied.  Defendant's motion to strike various documents (Doc. No. 48-1) is denied without prejudice as moot.

ENTER:

Dated:  September 26, 2001

REBECCA R. PALLMEYER
United States District Judge